Arrest on Out-of-District Offense

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### ARREST ON OUT-OF-DISTRICT OFFENSE

'07 MJ 89 07

Magistrate Case Number: _____

The person charged as ___Epifanio MERCADO___ now appears before this United States District Court

for an initial appearance as a result of the following charges having been filed in the United States District Court

for the ___Central_____ District of _____California_____

with ___Conspiracy to Possess with Intent to Distribute and Distribute Cocaine_____,

in violation of ___Title 21, United States Code, 841(a)(1) & 846_____

The charging documents and the warrant of the arrest of the defendant which was issued by the above

United States District Court are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge,

information and belief.

DATED:   __November 5, 2007__.

_____
MARC L. McCULLOCH
Special Agent
Federal Bureau of Investigation
(Name)

Reviewed and Approved:

Dated:   __November 5, 2007_____

_____
JOHN F. WEIS
Assistant United States Attorney

FILED

NOV 0 5 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# United States District Court

_____CENTRAL_____ DISTRICT OF _____CALIFORNIA_____

UNITED STATES OF AMERICA

v.

EPIFANIO MERCADO

**WARRANT FOR ARREST**
ON COMPLAINT

CASE NUMBER:

07-1796M-1

To: The United States Marshal or any
      Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest      EPIFANIO MERCADO
                                                                                Name

and bring him forthwith to the nearest Judge/Magistrate to answer a complaint charging him with

Conspiracy to Possess with Intent to Distribute and Distribute Cocaine in violation of Title 21, United States
Code, Section 846

with Bail fixed at $ To be set Duty Judge

REC: BY AUSA      DETENTION

Date: __October 26 2007__      HONORABLE SUZANNE H. SEGAL
                                                    Name of Magistrate Judge

_(signature)_
Signature of Magistrate Judge

| RETURN | |
|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ | |

| DATE RECEIVED | NAME & TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

Rev. 11/97

# CRIMINAL COMPLAINT

Agent

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>EPIFANIO MERCADO<br>and RICARDO NAVA | DOCKET NO.<br><br>FILED<br>CLERK, US. DISTRICT COURT<br><br>MAGISTRATE'S CASE №  OCT 26 2007<br>07-<br><br>07-1796M |
|---|---|

Complaint for violation of Title 21, United States Code, Section 846
(Conspiracy to Possess with Intent to Distribute and Distribute Cocaine)

| NAME OF MAGISTRATE JUDGE<br><br>HONORABLE SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATES OF OFFENSES<br>August 7, 2006-<br>July 11, 2007 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on or about August 7, 2006, and continuing to at least through July 11, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants EPIFANIO MERCADO and RICARDO NAVA, and others known and unknown, conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute more than 5 kilograms of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
        (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>SHAHNAZ P. VARGHESE |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT-DEA |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>SUZANNE H. SEGAL | |
|---|---|
| See Federal Rules of Criminal Procedure rules 3 and 54.<br>H:blh          REC: DETENTION (warrant) | DATE<br><br>October 26, 2007 |

<u>AFFIDAVIT</u>

I, Shahnaz P. Varghese, hereby swear and affirm as follows:

## I.  INTRODUCTION

1.   I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in Section 2516 of Title 18 of the United States Code.

2.   I have been employed as a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") since January 2005.  I am currently assigned to a Southwest Border group of the Los Angeles Field Division, tasked to investigate large-scale narcotics organizations.  Prior to employment with the DEA, I was a prosecuting attorney for approximately eighteen months.  I have received specialized training while attending the DEA Training Academy in Quantico, Virginia, concerning violations of the Controlled Substances Act within Title 21 of the United States Code.  During my employment with DEA, I have conducted and participated in a number of narcotics investigations along with other experienced SAs and law enforcement personnel.  These investigations involved: the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics (including cocaine, heroin, and methamphetamine), the

-1-

laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses. These investigations have involved debriefing defendants, witnesses, and informants, recruiting and directing informants, conducting surveillance and telephone toll analysis, applying for court orders authorizing wire interceptions, conducting wire intercept investigations, and applying for and executing state search warrants as well as executing federal search warrants. The investigations have resulted in the seizure of narcotics and narcotics-related assets, and arrests for narcotics-related offenses.

3.    This affidavit is made in support of a criminal complaint against and arrest warrants for **EPIFANIO MERCADO** ("**MERCADO**") and **RICARDO NAVA** ("**NAVA**") for violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute cocaine and possession of cocaine with intent to distribute). This affidavit is also made in support of search warrants for subject premises associated with **MERCADO** and **NAVA**, specifically: (1) 1211 Rock Springs Road, Norco, California ("**SUBJECT PREMISES 1**"); and (2) 23475 Marshall Street, Perris, California ("**SUBJECT PREMISES 2**"). The subject premises are fully described in Attachment A for each warrant. I believe the subject premises contain evidence, instrumentalities, and fruits of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute cocaine and possession of

-2-

cocaine with intent to distribute).  The items to be seized at each location are fully described in Attachment B to each warrant.

4.   I make this affidavit based upon information and evidence provided by witness statements, discussions, and reports submitted by other investigative law enforcement officers and agents, as well as physical evidence, telephone calls intercepted pursuant to court-authorized wiretaps, and my own personal knowledge and experience.  Because this affidavit is being submitted in support of a search warrant, I have not included each and every fact known to me concerning this investigation.

5.   Some of the intercepted conversations were in English, but most were in Spanish.  I base my knowledge of the contents of a call on transcripts or summaries prepared by agents or other monitors who listened to the calls; occasionally I have listened to the actual recording of a call.  For calls not in English, I have relied on translations.

6.   The identities of the suspects were ascertained through a variety of methods.  Some of these methods included names used by the speakers themselves during intercepted conversations, and surveillance activity, including enforcement activity by local law enforcement agencies, where the drivers of particular vehicles were identified.  The speakers also were identified by subscriber information, surveillance, voice identification by

agents and monitors who have compared voices, or by the speakers' own identification of themselves. The intercepted conversations were occasionally in English, but primarily in Spanish.

7. During the intercepted conversations, **MERCADO**, and others, used cryptic or coded language to discuss narcotics trafficking over the telephones. Through training and experience, I have determined that many of the terms used describe narcotics or narcotics-related activity.

## II. PROBABLE CAUSE THAT CRIMES HAVE OCCURRED

### A. OVERVIEW OF THE INVESTIGATION

8. Since 2006, the DEA and other law enforcement agencies have been investigating **MERCADO** and his cousin **NAVA**. On November 1, 2006, as a result of a traffic stop of a vehicle driven by **NAVA** in Bellflower, California, approximately eight kilograms of cocaine were located inside the vehicle and seized by law enforcement authorities. In addition, on December 9, 2006, approximately 20 kilograms of cocaine were seized from a trailer truck driven by Rafael Nava-Mercado ("RAFAEL"), **MERCADO'S** uncle. According to court-authorized wire interceptions on a telephone being utilized by **MERCADO** as well as an interview of RAFAEL, I believe that **MERCADO** was the source of supply of the cocaine seized on December 9, 2006.

### B. THE 8-KILOGRAM SEIZURE ON NOVEMBER 1, 2006

9. Based on information I received from other agents, I

-4-

know that the following occurred on November 1, 2006.

     a.   On the morning of November 1, 2006 surveillance agents observed **NAVA** and **MERCADO** exit a residence located at 1211 Rock Springs, Norco, CA (**SUBJECT PREMISES 1**) and drive in a white Toyota Camry with no license plates to the area of Perris, CA.

     b.   Due to the high rate of speed the Camry was driving (in excess of 80 mph), surveillance agents were unable to determine the location(s) in Perris where the Toyota Camry arrived at.  Based on my training and experience and other information from the investigation, I believe that **NAVA** traveled in the white Toyota Camry to **SUBJECT PREMISES 2** in order to drop off **MERCADO** at his residence (**SUBJECT PREMISES 2**).

    10.  On November 1, 2006, at approximately 1:05 p.m., Los Angeles Sheriff's Department ("LASD") Deputies were conducting surveillance in a Staples shopping center off the 91 Freeway and Lakewood Boulevard.

     a.   Deputies observed a black male, approximately six feet tall, 200 pounds, walk to the same white Toyota Camry that surveillance agents had observed that morning at **SUBJECT PREMISES 1**.  The black male sat inside the white Camry.  Shortly thereafter, **NAVA** and the black male stepped out of the white Camry and walked inside the Staples store.

     b.   At approximately 1:20 p.m., the black male and **NAVA** left the Staples store and walked to their vehicles.  The

black male walked to a gold Camry and **NAVA** walked to the white Camry.  Shortly thereafter, the black male's gold Camry left the Staples Parking lot, followed by the white Camry driven by **NAVA**.

11.  At approximately 1:23 p.m., LASD Deputies conducted a traffic stop of the white Toyota Camry with no license plates on it in order to warn and/or cite the driver of the vehicle for the violation.

a.  **NAVA** identified himself to a LASD Deputy.  A LASD Deputy asked **NAVA** for his driver's license and **NAVA** told the Deputy that his license was suspended.  Deputies conducted a records check and discovered three warrants for **NAVA's** arrest.

b.  Thereafter, LASD Deputies arrested **NAVA** for the warrants and impounded the vehicle.  A LASD Deputy asked **NAVA** if there was anything illegal inside the vehicle and **NAVA** told the Deputy "no."

12.  At approximately 1:27 p.m., pursuant to impounding the vehicle, a search of the Camry was conducted.

a.  LASD Deputies discovered the bottom cushion of the back seat of the Camry to be loose.  They lifted the seat bottom and found a plate that was not flush with the body of the vehicle.

b.  LASD Deputies removed the plate and found a hidden compartment with eight packages, wrapped in tape, which were of similar size, shape and weight and appeared to look like kilogram

-6-

sized packages of cocaine. A LASD Detective cut one of the eight packages open, which revealed a white powdery substance resembling cocaine. A subsequent test of the white powdery substance was confirmed to be cocaine.

C.   THE 20-KILOGRAM SEIZURE ON DECEMBER 9, 2007

13. On December 9, 2006, at 12:28 a.m., a Kansas Highway Patrol Trooper conducted a commercial vehicle inspection on a white 2004 Volvo Semi-Truck. The Trooper contacted the driver, RAFAEL Nava-Mercado.

a.   The Trooper conducted a consensual search of the vehicle and located 18 bricks of what appeared to be cocaine with a combined approximate gross weight of 20.2 kilograms. A subsequent test of the bricks confirmed the bricks to be cocaine.

b.   RAFAEL was arrested and admitted to Agents that he had touched the cocaine and the compartment and had knowledge of the cocaine being in the truck.

14. On December 11, 2006, court-authorized interceptions of a telephone being utilized by **MERCADO** revealed the following:

a.   **MERCADO** said they could not find the truck. **MERCADO** said that the people that were receiving the load had called the uncle's wife and said that if there had been a warrant, they would have called him to tell him to come pick up the load. Unidentified Male (UM) 44 said it was tough. UM44 asked if "Rob" had gone. **MERCADO** said this was already 5 or 6

-7-

days, or more than a week. **MERCADO** said he had taken a long route and had changed his phone numbers and now **MERCADO** could not locate him. UM44 said that he was told that as soon as the guy had gotten out, they had taken all the money. **MERCADO** said it was all strange.

b.   Based on my training and experience and knowledge in this investigation, I believe **MERCADO** was referring to the truck his uncle **RAFAEL** was driving, which was seized in Kansas. I believe **MERCADO** was indicating to UM44 that the company who was receiving the legitimate load of items which **RAFAEL** was delivering had been calling **RAFAEL**'s wife to find out **RAFAEL**'s whereabouts. I believe **MERCADO** indicated that "Rob," the intended recipient of the 20 kilograms seized, had changed his telephone numbers and **MERCADO** could not get a hold of him.

15.  On December 11, 2006, at approximately 12:57 p.m., **MERCADO** and UM44 spoke again.

a.   UM44 asked if the "taxi" was full. **MERCADO** said he was really upset, but not so much about "that." **MERCADO** said he just wanted to know what happened to that guy. **MERCADO** said, "it" didn't mean anything to him. **MERCADO** said he was having a gang of problems with his girl. UM44 said they would be moving "stuff" already. **MERCADO** said he didn't "give a fuck about that" and just wanted to find homeboy.

-8-

b.   Based on my training and experience, I believe
when UM44 asked if the "taxi was full," he was asking **MERCADO** if
the truck driven by RAFAEL had narcotics in it.  I believe
**MERCADO** indicated that he was not concerned about the narcotics,
but just wanted to know what happened to his uncle.

16.  On December 15, 2006, at approximately 4:34 p.m., court
authorized interceptions on a telephone utilized by **MERCADO**
indicated the following:

a.  **MERCADO** asked "SKIP" if he was almost done.  SKIP
said he was and asked **MERCADO** what he was going to do.  **MERCADO**
said he was going to send someone and wanted to know when SKIP
would be ready.  SKIP said he would know more in the morning.
SKIP told **MERCADO** to let him know when **MERCADO** was ready to send
"them", and that SKIP would be done by then.  **MERCADO** asked SKIP
if he got rid of some.  SKIP answered in the affirmative and said
he was pretty much done.  SKIP said he had someone who was
supposed to come out and meet SKIP tonight and that while this
person was taking care of that, he was going to "vacuum-seal the
cheese."  **MERCADO** said he did not know if ROB had anything to do
with it because "those things" were supposed to be for him, and
all of a sudden he disappeared.  **MERCADO** said he was somewhere
out here in **MERCADO's** area, but he did not want talk to **MERCADO**.
SKIP asked **MERCADO** if he believed "he" (ROB) was hot.  **MERCADO**
said he believed "he" (ROB) probably jacked the uncle and tied

-9-

Case 2:07-mj-08907-PCL   Document 1   Filed 11/05/07   PageID.13   Page 13 of 25

him up or something.  MERCADO said he did not know what to believe anymore.  The call continued with MERCADO asking SKIP if another individual by the name of GIGOLO was coming back on the bird.  SKIP said he was coming back on the ground since he drove the car out to SKIP's area with the pistols.  MERCADO asked SKIP if he believed he would bring "that" if MERCADO were to give GIGOLO some "cheese."  SKIP said he would let MERCADO ask him and put GIGOLO on the line.  MERCADO asked GIGOLO if he would bring back that "paper."  MERCADO said he wanted to avoid having to send someone to pick it up.  MERCADO asked GIGOLO if it was "hot" coming back and GIGOLO said it was and that he no longer did that.  MERCADO told GIGOLO that he would send a guy and did not want to be responsible if something happened.

b.  Based on my training and experience, I believe MERCADO began by asking whether SKIP had finished selling all the cocaine MERCADO had supplied so that MERCADO could send someone up to where SKIP was to collect the money.  I believe MERCADO indicated to SKIP that he still could not find RAFAEL and that he wondered if the individual named ROB had anything to do with RAFAEL's disappearance.  I believe when MERCADO said "those things were supposed to be for him," MERCADO indicated that the 20 kilograms of cocaine found in the truck driven by RAFAEL were intended for an individual named ROB.

17.  On December 16, 2006, court authorized interceptions on a telephone being utilized by **MERCADO** indicated the following:

a.  **MERCADO** said he found homeboy but that fool was gone.  JUAN asked **MERCADO** if he was referring to the "taxi." **MERCADO** said yes and that the fool was gone.  **MERCADO** said the "taxi was already asleep" and that fool was the only fool that knew that.  JUAN said "oh shit."  **MERCADO** said "he" (RAFAEL) was found not too long ago in Kansas.  Juan said the people out there had to have had something to do with it.  JUAN said this guy told JUAN that all ROB had lost was the "paper" Juan had told **MERCADO** about.  **MERCADO** said ROB knew everything.

b.  Based on my training and experience, I believe **MERCADO** indicated to JUAN that his uncle RAFAEL was located in Kansas but Rob had disappeared.  I believe when **MERCADO** said the "taxi was already asleep," he was indicating that RAFAEL was in jail and the kilograms of cocaine had already been seized.  I also believe **MERCADO** thought ROB was the only one who knew about the kilograms of cocaine and therefore was the reason why RAFAEL had gotten caught with the narcotics in his truck.

18.  On July 3, 2007, DEA Task Force Officers interviewed RAFAEL at the United States Attorney's Office in Topeka, Kansas; RAFAEL's defense counsel was present at the interview.  RAFAEL stated that he knew through family discussions that the source of supply for the cocaine RAFAEL had been transporting on December

-11-

9, 2006 was RAFAEL's nephew, **MERCADO**. RAFAEL stated **MERCADO's** right-hand man was **MERCADO's** cousin **NAVA**. DEA Task Force Officers showed RAFAEL pictures, without names or identifiers, of **MERCADO** and **NAVA**. RAFAEL positively identified both individuals and wrote their names next to each of their photographs.

## III. PROBABLE CAUSE FOR ITEMS TO BE SEIZED

19. For the following reasons, I believe that **SUBJECT PREMISES 1** is a residence or stash house used by **MERCADO**.

a. Surveillance officers observed **MERCADO** and **NAVA** leaving 1211 Rock Springs Dr. (**SUBJECT PREMISES 1**) on November 1, 2006.

b. AutoTrack/Choice Point Data information has a Sara Mercado listed under the address at 1211 Rock Springs Dr. I believe Sara Mercado is a relative of **MERCADO** because AutoTrack/Choice Point Data also lists an alternate address of Sara Mercado's as the same address on **MERCADO's** driver's license.

c. Based on my training and experience, and what I have learned in this investigation, I believe **MERCADO** does not utilize his own name regarding the ownership of his property. I believe this because several phones I discovered being utilized by **MERCADO** during this investigation did not list him as the subscriber of the telephone. In addition, the electricity records for this address were subpoenaed for this residence on

-12-

October 1, 2007.  The electricity subscriber for this address is
listed as Sahira Savilla.  I believe Sahira Savilla is not the
true billing party at this address.  Based on my training and
experience, I know that narcotics traffickers will attempt to
hide their true identity through various means, including, using
false subscriber names on the telephone(s) they use, listing
their homes in relatives' or friends' names, and driving vehicles
registered to others.

 20.  For the following reasons, I believe that **SUBJECT
PREMISES 2** is **MERCADO'S** primary residence:

  a.  Surveillance conducted by other agents indicates
that **MERCADO's** primary residence is a ranch located at 23475
Marshall St., Perris, CA.

  b.  The electricity subscriber at this address lists a
Delia Mercado as the billing party.  I believe Delia Mercado is a
relative of **MERCADO**.  AutoTrack/Choice Point Data also lists an
Adella Mercado under the address of **SUBJECT PREMISES 2**.  In
addition, an alternate address of Adella Mercado's is listed in
AutoTrack data as the same address on **MERCADO's** driver's license
(12141 Magnolia St., El Monte, CA).

  c.  In an interview with a Law Enforcement Agent,
**MERCADO** declared ownership of **SUBJECT PREMISES 2**.

  d.  On February 21, 2007, a state search warrant was

-13-

executed at **SUBJECT PREMISES 2** after information provided by a person believed to be an associate of **MERCADO** led law enforcement officers to believe that **SUBJECT PREMISES 2** was a meeting location for **MERCADO** and his narcotics associates. During the search of **SUBJECT PREMISES 2**, photographs of **MERCADO** were seen indicating **MERCADO's** possible ownership of **SUBJECT PREMISES 2**. In addition, **MERCADO's** mother was present at **SUBJECT PREMISES 2** and stated to law enforcement officers that **MERCADO** was the owner of the property.

e.  During the search of **SUBJECT PREMISES 2**, no narcotics were located.  The law enforcement agents who executed the warrant believe that the reason no narcotics were located was that **MERCADO** and/or his associates had been given a prior warning that law enforcement was going to conduct a search warrant at **SUBJECT PREMISES 2**, and therefore any narcotics which might have been present at **SUBJECT PREMISES 2** were removed from **SUBJECT PREMISES 2** prior to the search warrant being executed.

21.  Based upon my training and experience, I know that traffickers not only maintain multiple residences, but also keep drug trafficking evidence within reach to facilitate their trafficking activity.  Furthermore, the evidence described above clearly demonstrates that **MERCADO** has engaged in an ongoing pattern of drug trafficking for a significant period of time.

-14-

Moreover, given the large quantities of drugs and currency distributed by MERCADO, I believe MERCADO has been involved in drug trafficking for a much longer period of time than the period of the investigation. I believe MERCADO runs a large trafficking operation with more than one stash house is suggested by his direction of other traffickers, his apparent ability to casually absorb financial loss (the loss of the 20 kilograms of cocaine driven by RAFAEL), and his potential willingness to front drugs to customers such as SKIP.

A.   GENERAL ITEMS

22.   Based on my training and experience, as well as my conversations with senior agents and officers, I know the following about the use of businesses, residences, and vehicles by narcotics traffickers (hereinafter "traffickers"):

a.   Traffickers often place assets in names other than their own, to avoid detection of these assets by Government agencies.  Even though those assets are in other persons' names, the traffickers continue to use those assets and exercise dominion and control over them.

b.   Traffickers commonly "front" drugs to their customers by providing them narcotics prior to receiving payment. Traffickers maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, ordering, sales and distribution of controlled substances and

-15-

equipment, even though such documents may be in code. That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug traffickers have ready access to them - e.g., homes, offices, automobiles. Traffickers also keep evidence of financial transactions relating to the obtaining, transferring, secreting, or spending of large sums of money made from engaging drug trafficking activities in their residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

c. Traffickers frequently rent storage lockers to store controlled substances, and traffickers often have in their immediate possession, or in their residences, keys, receipts, and other documents evidencing the rental of said storage lockers. Traffickers commonly maintain in their residences addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if these items may be in code.

d. Traffickers often store information regarding their drug trafficking on computer databases. This information may be as simple as customer lists and may be as elaborate as documenting current transactions relating to narcotics trafficking.

e. Traffickers often launder money obtained through

-16-

illegal drug transactions through legitimate businesses. Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions. Nonetheless, to escape detection they mix and intermingle those records with records of lawful transactions, in such instances, it is necessary to analyze the entire record to isolate the records of unlawful transactions, and it is not feasible to extract the records of unlawful activities without such analysis.

f. Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances. Expensive items, particularly portable or leased items, such as jewelry, automobiles, audio-visual equipment, and precious metals, are indicative of narcotics trafficking when there is no indication that these items were purchased with income for legitimate sources.

g. Traffickers frequently continue their criminal activity over months and even years. The traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sale such drug traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.

-17-

h.   The trafficker keeps receipts of his or her illegal activities for a period of time extending beyond the time during which he or she actually possesses illegal controlled substances.  These records allow the trafficker to maintain contact with his or her criminal associates for future drug transactions, and so that he or she can have records of prior transaction for which, for example, he might still be owed money, or might owe someone else money.  In my conversations with more experienced agents, I have become aware of cases in which traffickers have maintained evidence or prior trafficking activities for three years after those activities.

i.   Traffickers often have firearms and other weapons at their residences and stash houses to protect their narcotics and the proceeds of their narcotics trafficking.

23.  Along with my general knowledge of narcotics traffickers and their use of residences and stash houses to further their trafficking activity, I know that both **MERCADO** and **NAVA** were present at **SUBJECT PREMISES 1** on the day that **NAVA** was found with 8 kilograms of cocaine in his car.  **MERCADO** and **NAVA** probably also drove to **SUBJECT PREMISES 2**.

B.   COMPUTER DATA

24.  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored

-18-

on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

> a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

> b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is

-19-

essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to

-20-

conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.   Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## IV.  SEALING REQUEST

25.  At or around the time the arrest and search warrants requested herein are executed, law enforcement officers will be arresting multiple targets of the government's criminal investigation and executing multiple search warrants at numerous locations within Los Angeles County and elsewhere within the Central District of California.  Premature disclosure of the contents of this affidavit could seriously impede the government's efforts to execute the additional arrest and search warrants by providing unarrested targets with information that may result in their attempts to flee or to destroy evidence. Accordingly, I request that the Court issue an order sealing this affidavit until further order of this Court.

-21-

## V.   CONCLUSION

26.   Based upon my training, experience, and the facts stated herein, I believe there is probable cause to believe that **EPIFANIO MERCADO** and **RICARDO NAVA** have violated 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute cocaine and possession of cocaine with intent to distribute).   I further believe that the items listed in Attachment B to each search warrant are the fruits, instrumentalities, and evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and will be found at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**, as more fully described in Attachment A to each warrant.


_____
SHAHNAZ P. VARGHESE
Special Agent
Drug Enforcement Administration


SUBSCRIBED TO AND SWORN BEFORE ME
THIS _26_ DAY OF OCTOBER, 2007


_____
         SUZANNE H. SEGAL
HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE